## THE PACIFIC.

## THE S. B. POMEROY.

### (District Court, E. D. Michigan. October 17, 1892.)

COLLISION—VESSELS ENTERING CANAL—EVIDENCE.

A schooner, the stern vessel in a tow lying near the lower entrance of the ship canal at Sault Ste. Marie, awaiting the locking through of another vessel, was injured by collision with a steamer. The libel therefor alleged that the steamer came up astern of the schooner with great speed, striking the dock, then bounding off and striking the schooner; and was supported by testimony of libelant and of the crews of the schooner, the tug, and another vessel in tow, which was contradicted by the evidence for the defense. From uncontested facts and testimony of disinterested witnesses, unimpeached, it appeared that, while the tow was moving up the river, the steamer was on her way to the dock, and came around under the stern of the schooner, and on her port side, between her and the dock. The wind, about northwest, varying from 22 to 36 miles per hour, would strike ascending vessels on the starboard bow, and the starboard side of the schooner was exposed to the full force of the wind and current. The injury to the schooner was confined to her plank-sheer, rail, and bulwarks, without any mark of the steamer's stem. The only damage to the steamer was the splintering of a starboard fender, and she had no mark, or even abrasion of paint, on either side; and the jar of the contact was scarcely noticeable on the steamer. *Held*, that the cause of the collision was that the schooner was suffered to drift, and the combined force of the wind and current carried her across the bow of the steamer, her rail and bulwarks receiving and yielding to her momentum as she rubbed along the fender of the steamer; and that the libel should be dismissed.

In Admiralty. Libel against the steamer Pacific for damages by collision with the schooner S. B. Pomeroy. Dismissed.

W. E. Leonard, for libelant.

Moore & Canfield, for claimant.

SWAN, District Judge. On the 10th day of May, 1890, between 5 and 6 o'clock P. M., the schooner S. B. Pomeroy, laden with 900 tons of coal, and the Canadian propeller Pacific, of the burden of 1,000 tons, came together in the River Sault Ste. Marie, in front of Kemp's dock at Sault Ste. Marie, Mich. The libel alleges in its third article "that, while lying at the entrance to the ship canal at Sault Ste. Marie, Michigan, * * * the steamer Pacific came up astern of the schooner S. B. Pomeroy with great speed, striking Kemp's dock, then bounding off and striking the schooner S. B. Pomeroy on the port side, breaking forty-two stanchions, breaking main rail, covering board, stringers, bulwarks, planking, monkey rail, timber head, and so forth."

The testimony of the master and eight other persons adduced on the part of the schooner is that at the time of the collision the Pomeroy was the stern vessel in the tow of the steamer George L. Colwell, which also had in tow the schooner D. P. Dobbins. The Colwell, Dobbins, and Pomeroy arrived near the lower entrance of the ship canal between 5 and 6 o'clock P. M., where they were compelled to wait the locking through of another vessel. The Colwell steamed slowly to the government pier next to the entrance to the lower lock, and made fast to the pier about 250 feet below the lock. The Dobbins followed the Colwell, and also got out her lines to the government pier, about the length of her towline below the Colwell, while the Pomeroy lay in the stream her towline's length astern of the Dobbins, at a distance of 30 to 60 feet away from Kemp's dock, and below the government pier, at which the Colwell and Dobbins lay, held by her towline to the Dobbins. That the tow had been in this position from 30 to 45 minutes, as variously stated by the witnesses for libelant, when the steamer Pacific, which had left the port of Sault Ste. Marie, Ont., usually called the "Canadian Soo," approached Kemp's dock at a speed of from 5 to 8 miles an hour, intending to stop as usual, but struck the dock with such force that she glanced off, and shot out into the stream, until she collided with the Pomeroy, as charged in the libel, doing all the damage for which recovery is sought.

The story of the libelant is founded on his own testimony and that of members of the crews of the Colwell, Dobbins, and Pomeroy. The defense is as strongly pleaded and supported by the proof as the libel. The answer sets forth—

"That on or about the 10th day of May, 1890, the steamer Pacific was bound on a voyage from the port of Collingwood to the port of Sault Ste. Marie, and in the afternoon of said day arrived at Kemp's dock, on the south side of Sault Ste. Marie river, at the entrance to the canal. That when approaching said dock, with her full watch on deck, and properly stationed, and attending to their respective duties, the watch perceived a vessel, which afterwards proved to be the schooner Pomeroy, in tow of a steam barge, and some distance to the north of the Pacific and the center of the channel, going very

slowly, and apparently intending to go through the canal. That the Pacific ran alongside of Kemp's dock, there being plenty of room between said vessel and said dock, and made fast to said dock. That, said vessel being some little distance away from said steamer, out in the stream, some little time after said Pacific was made fast to the dock, said schooner, by reason of the negligence, carelessness, and inattention of those in charge of her, was permitted to drift against said steamer Pacific, striking her somewhere aft of the forward gangway. Said schooner still moved slowly, being drawn by her towline from the steam barge until she had passed the Pacific. That during the whole time the said vessel was in contact with the steamer,—in fact, some time before,—the steamer was fastened to the dock; and that, except as herein stated, said steamer did not in any way strike or touch said vessel."

The records of the weather bureau for that day show that the wind at Sault Ste. Marie was about northwest, and varied in velocity from 22 to 36 miles per hour at the place of this collision. This would strike ascending vessels on the starboard bow. Several of the witnesses for libelant stated that there was little, if any, wind at the time of the collision, but their examination showed that they paid but little attention to the course or strength of the wind, and their testimony upon this point is valueless. The evidence preponderates in support of the observations of the signal service. The natural effect of the wind and the current was to cause a vessel not under headway to drift down and onto the American, or southerly, shore of the dock line. There is a hopeless conflict of evidence upon important points of the case, yet the data for its determination are afforded by uncontested facts. The Colwell, with her tow, arrived at Sault Ste. Marie at 5:30 P. M. As she drew near the canal, her speed was checked as usual, and she moved slowly to the government pier, where she made fast, waiting her turn to enter the locks, which were then occupied by a tow. At 5:50 P. M., canal time, she moored about 250 feet below the lower gate, at a point about 700 feet above the upper end of Kemp's dock, which is next below the government pier, with which it forms an angle of about two points. The line of Kemp's dock is about east and west, while that of the government pier above it runs about E. N. E. and W. S. W. Kemp's dock is 441 feet long. The collision took place about 150 or 200 feet from its lower end, or about 900 feet below the position occupied by the Colwell. The Dobbins made fast to the pier at its junction with Kemp's dock, and some 300 or 350 feet below the Colwell's stern. Below the Dobbins, and out in the stream, lay the Pomeroy, held by her towline to the Dobbins. The witnesses for libelant state that the vessels had been in these positions from 15 to 30 minutes when the collision occurred. About 6:35 P. M., by Canadian time, which is an hour faster than Sault Ste. Marie time, the Pacific left the International dock, on the opposite or Canadian side of the river, and made her landing at Kemp's dock, her regular stopping place. It will be seen, making allowance for the difference in time, that while the tow was still slowly moving up the river, the Pacific was on her way to Kemp's dock. The Colwell and Dobbins had both passed that point before the Pacific came around under the stern of the Pomeroy, and between the latter and the government pier below Kemp's dock, which was the Pacific's course. There was nothing in the situation calling upon the Colwell or the Dobbins to note the position or movements of the

Pacific, but the masters and crews of both those vessels were naturally and properly giving their attention to their management, preparatory to a temporary mooring, waiting the opening of the lower gate of the canal. While they were thus engaged, the Pacific was rounding the stern of the Pomeroy on her way to Kemp's dock. She passed up on the Pomeroy's port side, and, I am satisfied from the evidence of her crew and of Kemp, Lyons, Hutton, and Thompson,—the two latter being wholly disinterested,—reached Kemp's dock before the Pomeroy had got abreast of it, but after the Colwell and Dobbins had passed it, and had got out their lines to the government pier. This view of the order of events is sustained by the testimony of the master, first and second mates, and two wheelsmen of the Pacific, all of whom were in positions which gave them unobstructed sight of the dock and the Pomeroy. If this conclusion rested upon their testimony alone, it would still be sustainable, because they are consistent with each other, and their opportunities for knowledge of the movements and relative positions of the Pomeroy and Pacific at the time of their arrival at Kemp's dock were at least equal to those of the same number of libelant's witnesses, who saw the collision from the Pomeroy, and the tug Mary Virginia, which had the Pomeroy in charge, yet do not agree with each other as to the manner of the occurrence of the collision, nor with the best evidence of the direction and weight of the wind. The objection that the testimony of the Pacific's crew is inspired by their relation to the steamer is equally forcible against the credit to be given to the libelant, Smith and Barras of the Pomeroy, and Green and Mann of the tug Mary Virginia; the two latter having as much at stake as the crew of the Pomeroy, for, if the defense is established, the fault of the collision might lie with their tug, which was charged with the duty of caring for and handling the Pomeroy while she was awaiting the opportunity to enter the canal. The bias of the witnesses is equally as strong on one side as the other, but, laying out of consideration the testimony of the Pacific's crew, and treating that of Kemp and Lyons as equally biased, because Kemp was the steamer's agent at Sault Ste. Marie, and Lyons was his employe, (though I find nothing impeaching in the least the veracity of either Kemp or Lyons,) there remain two witnesses, Hutton and Thompson, wholly disinterested, who in all things confirm the defense.

It was Thompson's duty, as watchman of the canal, to note the arrival of vessels at that point, and to see that they moored within prescribed limits. In the discharge of that duty he naturally observed the movements of the Colwell, Dobbins, and Pomeroy, and likewise the Pacific. He had no apparent motive to falsify, and his credit is unassailed. He testifies positively that the Pomeroy was suffered to sag into the Pacific after the latter had made fast to her dock, the Pomeroy being impelled by the strong northwest wind. Hutton, a reputable butcher of Sault Ste. Marie, had visited the Pacific to sell supplies, and was watching the Pomeroy's approach for the same purpose. He saw her sag into the Pacific, and corroborates fully the claim of the defense and the testimony of Thompson. Aside from the testimony of the witnesses on the George L. Colwell, (which, because of her location and remoteness from the scene of collision, is valueless,) there is no

evidence from any impartial witness which impairs the force of this testimony. It not only comes from a neutral source, uncolored by interest, but it entirely accords with the conditions of navigation at the time of the collision, and equally with the results to the Pomeroy and the Pacific. If, as is claimed by libelant, the Pomeroy had no headway, but lay heading into the dock with her stern projecting into the stream, her whole starboard side was exposed to the full force of the strong northwest wind and the current, while her spars and rigging aided her drift in shore and onto the Pacific. This effect of wind and current were unnoticed by the master of the tug until too late to counteract it or avert its consequences. The whole lateral momentum of the Pomeroy and her cargo of 900 tons of coal was thus thrown upon her rail and bulwarks and the fender of the Pacific. As she moved along before the wind with her stern in the current and her bow in the eddy close to the dock, the effect of this force was to press her rail and bulwarks against the fender of the Pacific, and thus continue the damage until the vessels had separated. The facts that the Pacific suffered no other damage than the splintering of the fender, while the injury to the Pomeroy was confined to her plank-sheer, rail, and bulwarks, are strongly persuasive in themselves that the schooner was the aggressor. There was no breaking or indentation in her planking, nor damage to her standing rigging. There was no mark of the Pacific's stem anywhere on the schooner. There was no mark, nor even abrasion of paint, on either side of the Pacific. Her fenders on the port side next to the dock were intact. If she struck the dock while moving at the rate of eight miles an hour, as Walters, Barras, and Mann have sworn. or even at half that speed, her hull and fenders on the port side of the dock must have shown some evidence of the contact. Nothing of the kind appears. Libelant Walters testifies that the Pomeroy at the time of the collision lay with her bow about 25 feet and her stern about 35 feet from Kemp's dock, and was about abreast of the office on that dock; that is, directly abreast of that part of the dock at which the Pacific landed. In a libel filed August 19, 1891,—about a week before the present libel was verified and filed,—libelant alleged that the Pomeroy was lying about 75 or 80 feet from Kemp's dock when struck, and that there was ample room between the dock and the schooner for the steamer to have made her landing in safety if she had been navigated with proper care and skill, but she was run at such high speed that, striking "the dock or the spring piles forming a part of the same, said Pacific rebounded from said dock, and struck said schooner with great force, and so forth." The testimony is undisputed that there were no spring piles at this dock. Libelant further testifies that the effect of the blow was to force the Pomeroy ahead, and past the dock, until her bow struck a small lighter lying at Kemp's dock, a few feet above the Pacific. All agree that the Pomeroy was heading somewhat onto the dock line before and at the time the vessels collided. She was drawing 12 feet, and laden with about 900 tons of coal. The Pacific had a registered measurement of about 1,000 tons, and is 183 feet long and 35-foot beam. If the Pomeroy's stern, as claimed on the hearing, was about 35 feet from the dock, it is manifest that the effect

of forcing the Pacific between the Pomeroy and the dock would be to drive the schooner still further into the stream, and away from the dock. It is possible, if she struck the Pomeroy near the mizzen rigging, that the impact would swing the schooner's head to port,—that is, towards the dock; but the force necessary to produce that effect on a vessel of the schooner's draft and lading, and to drive her stern against wind and current, would have left unmistakable marks upon the hull of the schooner, or more probably would have crushed her planking. The resistance offered by the schooner's rail and bulwarks to the momentum of a steamer of the size of the Pacific, moving at even four miles an hour, was not enough to effect such a change in her position. Again, if the Pomeroy lay thus close to the dock,—about the width of the Pacific,—it is difficult to believe that Capt. Campbell, a competent master, whose skill is unquestioned, and who had had nine years' experience in the navigation of the Pacific, would have hurled his steamer at this dangerous speed between the dock and the schooner. If we accept the claim of the first libel, that the schooner lay 75 or 80 feet out from the dock, there was ample room for the steamer to land, and the testimony of the libelant is beset with the same inherent improbabilities. Had the Pacific struck and bounded off the dock at a speed of eight miles per hour, as charged, or at half that speed, her momentum would have crushed in the schooner's planking, and sunk her instantly. At any rate of speed whatever, the effect of contact with the dock would not have been to rebuff the steamer laterally into the schooner, as must have been the case if the position of the schooner in relation to the steamer's landing is even approximately correct. With the steamer and the schooner in these relative positions, it would have been impossible for the Pacific, if she had struck and rebounded from the dock, to hit the Pomeroy aft of the fore rigging. In short, both the probabilties and possibilities of the situation refute the libel. I am satisfied that the Pomeroy, while lying in the stream, with the tug alongside and in reliance upon the vigilance of the latter's crew and her power to take care and adopt seasonable measures to protect the vessel against the dangers of the situation, for which purpose the tug was employed, was suffered to drift, and that the combined force of the wind and current, which co-operated, carried her across the bow of the Pacific, the schooner's rail and bulwarks receiving and yielding to the momentum of the vessel as she rubbed along the fender of the Pacific. The master of the tug admits that he scarcely felt the jar of the contact, and the witnesses for the respondent state that it was slight, and scarcely noticeable on the steamer. This obviously would not have been the case had the steamer run into the schooner in the manner alleged in the libel.

A decree will be entered dismissing the libel, with costs.